**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **BARNARD CONSTRUCTION COMPANY, INC.,** | § § § | |
| *Plaintiff,* | § § § | |
| **v.** | § § § | **Civil Action No.:**_____ |
| **JACOBS ENGINEERING GROUP, INC., CDM CONSTRUCTORS, INC., HOUSTON WATERWORKS TEAM, FIDELITY AND DEPOSIT INSURANCE COMPANY, FEDERAL INSURANCE COMPANY, and BERKSHIRE HATHAWAY SPECIALTY INSURANCE COMPANY** | § § § § § § § § § | **JURY TRIAL DEMANDED** |
| *Defendants.* | § § | |

**PLAINTIFF BARNARD CONSTRUCTION COMPANY, INC.'S
ORIGINAL COMPLAINT**

Plaintiff Barnard Construction Company, Inc. files this Original Complaint against

Defendants Jacobs Engineering Group, Inc. CDM Constructors, Inc., Houston Waterworks Team,

Fidelity and Deposit Company of Maryland, Federal Insurance Company, and Berkshire Hathaway

Specialty Insurance Company.

### A.    INTRODUCTION

1.    This lawsuit stems from a $1.4 billion construction project in Harris County, Texas,

known as the Northeast Water Purification Plant Expansion Project ("Project"). The City of

Houston, as the Project owner, hired Defendant Houston Waterworks Team ("HWT"), which is a

joint venture between Defendants Jacobs Engineering Group, Inc. ("Jacobs") and CDM

Constructors, Inc. ("CDM"), as the design-build general contractor. HWT then subcontracted with

Barnard Construction Company, Inc. ("Barnard"), to perform an "early works" package. This initially included shoring, dewatering, tunneling, and installation of the dual 108" raw water transmission pipelines that would bring water from the area of Lake Houston to the water treatment facility. Defendants Fidelity and Deposit Company of Maryland ("Fidelity"), Federal Insurance Company ("Federal"), and Berkshire Hathaway Specialty Insurance Company ("Berkshire") are sureties for the Project. The overall project also included other work not within Barnard's scope but to be performed by other contractors contemporaneous with and subsequent to Barnard's work, including the construction of a water intake structure and expansion of the actual purification plant. This additional construction made up the entire Project and all needed to be finished before the plant would be finally completed and become operational.

2.        After Barnard began to mobilize, the Project became delayed due to issues outside of Barnard's control, and often squarely under HWT's control. When Barnard attempted to work through these delays and address them with HWT, Barnard was met with great hostility. For example, when Barnard requested compensation for delays and/or extra work as allowed under its Subcontract, HWT responded by telling Barnard it was "going to f**k [Barnard] up," "come at [Barnard] with everything we've got," and that it "will compile information and eat [Barnard] alive!" Consistent with these threats, Jacobs and CDM, through HWT began to interfere, further delay, and change the scope and manner of work performed by Barnard, and then threaten Barnard with claims for liquidated damages. Barnard dutifully continued to work in the face of such interference and overt hostility. Yet, as a direct result of Jacobs, CDM, and HWT's wrongful conduct, Barnard is entitled to additional compensation of at least $18,525,511.00 for the delays, changes in scope and manner of work, and additional expenses incurred. As such, this lawsuit has become necessary.

## B.    PARTIES

3.      Plaintiff Barnard Construction Company, Inc. is a corporation duly organized and existing under the laws of the State of Montana, in good standing, with its principal place of business in Bozeman, Montana.

4.      Defendant Jacobs Engineering Group, Inc. is a corporation organized under the laws of Delaware with its principal place of business at 155 North Lake Avenue, Pasadena California 91101. Jacobs Engineering Group, Inc. may be served by service upon its registered agent for service of process, CT Corporation, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

5.      Defendant CDM Constructors, Inc. is a corporation organized under the laws of Massachusetts with its principal place of business at 75 State Street, Suite 701, Boston, Massachusetts 02109. CDM Constructors, Inc. may be served by service upon its registered agent for service of process, CT Corporation, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

6.      Defendant Houston Waterworks Team is a joint venture whose business address is 12630 Water Works Way, Humble, Texas 77396. Its joint venturers are Defendant Jacobs Engineering Group, Inc. and Defendant CDM Constructors, Inc. It may be served by service through either of its joint venturers: (a) Jacobs Engineering Group, Inc. by service upon its registered agent for service of process, CT Corporation, 1999 Bryan Street, Suite 900, Dallas, Texas 75201, or (b) CDM Constructors, Inc. by service upon its registered agent for service of process, CT Corporation, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

7.      Defendant Fidelity and Deposit Company of Maryland is an insurance company organized under the laws of Maryland with its principal place of business at 1299 Zurich Way, Schaumburg, Illinois 60196. It may be served by service upon its registered agent for service of process, Corporation Service Company, 211 East 7th Street, Suite 620, Austin, Texas 78701.

8.     Defendant Federal Insurance Company is an insurance company organized under the laws of Indiana with its principal place of business at 202 Halls Mill Road, Suite B, Whitehouse Station, New Jersey, 08889. It may be served by service upon its registered agent for service of process, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

9.     Defendant Berkshire Hathaway Specialty Insurance Company is an insurance company organized under the laws of Nebraska with its principal place of business at 1314 Douglas Street, Suite 1400, Omaha, Nebraska 68102. It may be served by service upon its registered agent for service of process, Corporation Service Company, 211 East 7th Street, Suite 620, Austin, Texas 78701.

### C.     JURISDICTION AND VENUE

10.     This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. §1332(a) because this lawsuit involves a controversy between parties of diverse citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs. Plaintiff Barnard Construction Company is a Montana company with its principal place of business in Bozeman, Montana. Defendant Jacobs Engineering Group, Inc. is a Delaware corporation with its principal place of business in California. Defendant CDM Constructors, Inc. is a Massachusetts corporation with its principal place of business in Massachusetts. As an unincorporated joint venture, Defendant Houston Waterworks Team citizenship is determined by the citizenship of its joint venture members, Defendant Jacobs Engineering Group, Inc. and CDM Constructors, Inc. Defendant Fidelity and Deposit Company of Maryland is a Maryland insurance company with its principal place of business in Illinois. Defendant Federal Insurance Company is an Indiana insurance company with its principal place of business in New Jersey. Defendant Berkshire Hathaway

Specialty Insurance Company is a Nebraska insurance company with its principal place of business in Nebraska.

11.     Venue is proper in the Southern District of Texas under 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in the Southern District of Texas. The contract at issue, Subcontract No. 697592-4010 was executed in the Southern District of Texas. The underlying Project at issue is in the Southern District of Texas. The services and materials provided by Barnard to Defendants were provided in the Southern District of Texas. The wrongful conduct by Defendants complained of herein occurred in the Southern District of Texas. Accordingly, venue is proper in the Southern District of Texas.

### D.     FACTUAL BACKGROUND

12.     Barnard specializes in a variety of construction areas, including transmission pipelines. HWT, which is a joint venture between Jacobs and CDM, is the general design-build contractor on the Project, which is located at 12121 North Sam Houston Parkway East, Humble Texas 77396, in Harris County, Texas. The Project involves the expansion of the Northeast Water Purification Plant. The City of Houston is the ultimate owner and end user of the Project. Barnard subcontracted with HWT to furnish shoring, dewatering, tunneling, and furnish and installation of the dual 108" raw water transmission pipelines.

**Background of the Project**

13.     On or about July 10, 2017, HWT issued its Request for Proposal seeking competitive sealed proposals for the construction of the EWP4 – 108-Inch Transmission Mains at the Northeast Water Purification Plant Expansion Project. HWT's Request for Proposal included an outlined schedule, which identified February 12, 2018 as the subcontractor mobilization date

for the work at issue in the Request for Proposal. At the time HWT issued its Request for Proposal, its design documents for the Project were only sixty percent (60%) complete.

14.     On or about August 4, 2017, Barnard submitted its Proposal for the Project totaling $34,791,252, which includes a 15% contingency amount that was not included in the contract price. So, the original contract price totals $30,291,317.10. Barnard's Proposal included numerous clarifications, assumptions, and exclusions based on the incomplete nature of HWT's 60% design documents.

15.     On or about September 18, 2017, HWT issued its Notice of Selection – Intent to Award, which notified Barnard of HWT's intent to enter into a formal subcontract with Barnard for the Project. HWT also authorized Barnard to proceed with the development of a master schedule, production of submittals, and pre-construction work required ahead of the anticipated subcontract award. HWT also directed Barnard to furnish revised pricing based on updated draft IFC drawings.

16.     Even though a subcontract had not yet been entered and even though HWT had yet to provide completed design documents, Barnard nevertheless worked with HWT by complying with HWT's directives. It provided HWT with revised proposal amounts on September 29, 2017, October 18, 2017, and November 3, 2017. On or about November 1, 2017, Barnard also purchased the steel needed for the 108" pipeline.

17.     On or about March 6, 2018, HWT and Barnard executed Subcontract No. 697582-4010 ("Subcontract") for Barnard to furnish shoring, dewatering, tunneling, and furnish and installation of the dual 108" raw water transmission pipelines.[1] The Subcontract was based on

---

[1]A true and correct copy of the Subcontract between HWT and Barnard is attached hereto as **Exhibit A**.

Draft IFC Drawings and Specifications dated August 2017 and the scope of work identified in Attachment A-3-1 Detailed Scope of Work. The original Subcontract price was $31,297,111.

18.     The Subcontract identified a Notice to Proceed on March 7, 2018 and a Substantial Completion date of April 7, 2019, per the requirement that Substantial Completion be no later than 13 months following the date of Notice to Proceed.

19.     The Draft IFC Drawings and Specifications, upon which the Subcontract was based, were still not complete. Both Barnard and HWT understood that, in light of the incomplete nature of the Draft IFC Drawings and Specifications, Barnard would ultimately receive a change order reflecting the reconciliation of the draft Subcontract documents from the draft version of those drawings to the final Issued for Construction design version.

20.     Barnard bid the Project, executed the Subcontract, and ultimately commenced work based on the reasonable understanding that it would be allowed to perform its work in an orderly, efficient, and sequential manner, and that change orders would be used to compensate Barnard for additional work or changes in the work requested or required by HWT. Barnard also reasonably anticipated that its work on the Project would be free of HWT interference and that HWT would reasonably cooperate with Barnard's efforts. This proved to not be the case.

**HWT's Changes and Project Delays**

21.     The changes and delays began in the first days of the Project. Critical to Barnard's ability to perform its work was the removal of a powerline stretched across the corridor where Barnard was to work. HWT knew the powerline was an issue and in Addendum No. 3 to its Request for Proposal, told Barnard that the powerline would be removed prior to the required March 2018 mobilization of Barnard so that work could be performed as scheduled.

22.     Contrary to the representations by HWT, the powerline removal was not complete until June 28, 2018, which forced Barnard to work around the powerline during construction of the entry shaft, delay commencement of trench shoring and 108" waterline installation, delay construction of the temporary access road used to support construction operations, and resequence its work on the Project.

23.     Despite impediments to Barnard's work caused by issues beyond Barnard's control, as well as notice of the same, HWT demanded that Barnard prepare a "recovery schedule" on August 13, 2018 to accelerate construction of the Project. Notwithstanding this directive, HWT seemingly recognized its responsibility for the changes and delays. For example, in Change Order No. 2, which was issued just 13 months into the Project, HWT granted Barnard an additional 237 days to complete its work. In other words, HWT acknowledged that during the first 13 months, Barnard was only allowed to perform 7.5 months' worth of construction. Yet, HWT continues to refuse the additional compensation owed related to other delays and changes.

24.     In the period from September 2018 to November 2018, following HWT's demand for a "recovery schedule", Barnard encountered unusually severe and abnormal precipitation compared to the ten-year average weather statistics compiled by NOAA. The abnormal weather conditions resulted in 13 calendar days of critical path delay to Substantial Completion of the Project. Despite powerline delays and additional inclement weather delays, and despite its acknowledgement that its actions and inactions had caused project delay, HWT again demanded Barnard to prepare a "recovery schedule" on November 21, 2018 to accelerate construction of the Project.

**HWT's Response to Changes and Project Delays**

25.     HWT greeted Barnard's contractually required delay and interference notifications with antagonism and hostility. During one interaction between HWT and Barnard, HWT representative, Pete Stringer confronted Barnard and said, in response to a potential delay claim, threatening that HWT would "compile information and eat [Barnard] alive." After the submission of the weather delay claim by Barnard in the Fall of 2018, HWT again confronted Barnard and said it was "going to f**k you up", "you guys are f**cking dead", "you don't know what you're doing", "we're going to come at you with everything we've got."

26.     This response by HWT was put into practice in the way HWT dealt with Barnard. For instance, HWT made it extremely difficult for Barnard to obtain information concerning the design and coordination of the work to be performed. During the project, Barnard issued over 200 Requests for Information seeking information and clarification from HWT concerning design clarification, design coordination, constructability issues, changes in scope, errors and omissions, unforeseen conditions, and other issues encountered during its progression of work. All too frequently, HWT ignored these requests or failed to meet the contractually required response times.

27.     HWT also began a systematic pattern of interference in Barnard's work through a flurry of activity hazard analyses, work plan changes, and new requirements for the work. HWT instructed Barnard to issue over 60 Activity Hazard Analyses and Work Plans as well as 40 revisions to same to comply with HWT's additional and ever-changing requirements concerning construction means, methods, techniques, sequences, procedures, and safety and security programs. HWT used Barnard's requests for information and submittals on the Project as a means to demand changes in scope and changes in the manner of performing the work.

28.     HWT also continued to withhold information, change the plans, and add new work

and requirements seemingly in an attempt to deny Barnard's substantial competition, adding new

costs to Barnard, and threatening to seek liquidated damages for delay against Barnard. An

example of HWT's unreasonable extending completion is its new requirement that Barnard

perform temporary access road and site restoration additional work through August 21, 2020 when

Barnard demobilized from the Project. As of the date of this filing, HWT continues to add items

to the punchlist and maintain its position that Barnard is not substantially complete. Put another

way, Barnard continues to incur costs as a result of HWT interferences and extra contractual

directives and faced HWT's continued threat of liquidated damages.

29.     Despite such conduct by HWT, Barnard contends it achieved Substantial

Completion of the Project in according with the Subcontract on April 20, 2020.

**Impact of HWT's Misconduct**

30.     HWT's directives, actions, and inactions caused adverse effects on the time, cost,

and complexity of Work on the Project.  Barnard incurred a total of 256 calendar days of critical

path delay beyond Change Order No. 2 that extended Barnard's demobilization from the Project

to August 21, 2020. Barnard also incurred additional costs of performance for which it is entitled

to additional compensation, including the following:

a. $3,490,901 for 72 calendar days of critical path delays attributable to HWT changes in
   the scope and manner of performing the Work at Sta. 126+26 to 129+29 in the period
   from July 18, 2019 to February 11, 2020.

b. $1,454,542 for 30 calendar days of impacts to the progression of critical path work at
   Sta. 126+26 to 129+29 attributable to Tropical Storm Imelda in the period from
   September 17, 2019 to January 15, 2020.

c. $2,346,854 for 141 calendar days of critical path delays attributable to HWT changes
   in the scope and manner of performing Work for the temporary access road and site
   restoration in the period from December 13, 2019 to August 14, 2020.

d. $216,377 for 13 calendar days of impacts to the critical path work for the new temporary access road required by HWT during COVID-19 travel and work restrictions in the period from March 18, 2020 to April 30, 2020.

e. $389,304 for labor productivity losses caused by HWT's interference with Barnard's means, methods, and sequences. HWT's directives, actions, and inactions prevented Barnard from achieving budget production rates for excavation and shoring, pipe installation, and CLSM installation.

f. $827,296 for labor productivity losses caused by restricted work fronts at Station 126+26 to 129+29, Station No. 100+50, Station No. 133+39 to 134+50, and Station No. 140+00 to 145+00 as well as HWT's directive to accelerate work dated September 24, 2019.

g. $1,376,548 for expanded jobsite overhead costs in the period from April 24, 2019 to November 30, 2019 based on HWT's actions and inactions on the Project that interfered with Barnard's means and methods, disrupted its workflow, and increased the time, cost, and complexity of the Project.

h. $340,834 for HWT's changes in scope and manner of performing the Work caused by the box culvert at Station No. 100+50. Barnard incurred additional labor, equipment, material, and subcontractor costs to perform additional work and alter its planned means, methods, and sequences at the direction of HWT.

i. $558,831 for additional direct costs incurred to remove sediment and debris from the pipeline, support and employ a hazard remediation specialist, and complete sediment and debris removal from the pipeline as required by HWT in the aftermath of Tropical Storm Imelda.

j. $1,436,389 for change in scope and manner of performing the work based on HWT's directives concerning the temporary access road and site restoration additional work. Barnard incurred additional labor, equipment, material, and subcontractor costs to construct the HWT-directed temporary access road that was excluded from Barnard's Subcontract No. 697592-4010 and perform additional site restoration work at the direction of HWT.

k. $56,549 for additional direct costs caused by HWT's new enhanced protective measures during COVID-19. Barnard incurred additional costs for site travel restrictions, protective masks, hand sanitizer, and disinfectant supplies.

l. $1,826,697 for change in scope and manner of performing the work based on HWT's prohibition of the factory cut for MK141and HWT's direction to change the planned means and methods for installing the 108" waterline to the northeast of the circular shaft. HWT's directives, actions, and inactions caused Barnard to incur additional labor, equipment, material, and subcontractor costs to design and construct the circular

exit shaft required to circular exit shaft to allow adequate clear span for MK141 as well as additional subcontractor costs to design and construct a new decline tunnel.

m. $160,100 for Issued for Construction changes to the Traffic Control Plan, which caused Barnard to incur additional labor, equipment, and subcontract costs.

n. $173,497 for change in scope and manner of performing the work based on authorization to proceed with a permanent storm drain system at Station No. 142+50 via RFI No. 125 and subsequent directive to remove the system and re-install a new 66" storm drain. Barnard incurred additional labor, equipment, material, and subcontractor costs to remove the permanently installed storm drain system and re-install the new 66" storm drain.

o. $195,254 for additional engineering costs to comply with HWT directives for additional work and additional requirements concerning construction means, methods, techniques, sequences, procedures, and safety and security programs.

31.     In addition to the additional compensation owed to Barnard, HWT has failed and refused to pay for Invoice Nos. 25-29, and for unpaid retainage owed to Barnard. HWT is currently withholding $1,499,687 from Barnard Invoice Nos. 25-29 and retainage totaling $1,591,298. These withholdings are not justified, and the amounts are owed to Barnard.

32.     Barnard also incurred additional consulting fees, overheard costs, and legal fees in the preparation of its claims due to HWT's wrongful withholding of the additional compensation, invoice amounts, and retainage.

### E.     CAUSES OF ACTION

**Cause of Action No. 1: Breach of Contract**

33.     The allegations in paragraphs 1 through 32, inclusive, are re-alleged and incorporated herein by this reference as though set forth in full herein.

34.     Barnard asserts a breach of contract claim against HWT and, by virtue of HWT being a joint venture, Jacobs and CDW. The Subcontract constitutes an enforceable contract. HWT, Jacobs, and CDW have breached their contractual obligations to Barnard. These breaches include but are not limited to, HWT's failure to approve the additional compensation outlined

above, interference with Barnard's efficient and economically planned work flow, the delay of the Project and critical path, the refusal to pay for extra work that Barnard performed outside the scope of its base contract,  the refusal to pay Invoice Nos. 25-29 in full, and the refusal to pay retainage.

35.     As a result of the HWT, Jacobs and CDM's breach of their contractual obligations to Barnard, Barnard has sustained injuries and damages that were the natural, probable, and foreseeable consequence of the breaches.  Barnard hereby seeks its actual damages, attorneys' fees and expenses, court costs, and pre-judgment and post-judgment interest. Because HWT is a joint venture and Jacobs and CDM are the joint venturers, Jacobs and CDM remain liable for HWT's conduct.

**Cause of Action No. 2: Quantum Meruit and Unjust Enrichment**

36.     The allegations in paragraphs 1 through 32, inclusive, are re-alleged and incorporated herein by this reference as though set forth in full herein.

37.     Alternatively, Barnard asserts claims for quantum meruit and unjust enrichment. Barnard provided valuable services and materials to HWT.  HWT accepted the services and materials provided by Barnard.  HWT had reasonable notice that Barnard expected compensation for the services or materials.  Despite such notice, HWT has failed and refused to provide compensation for the services or materials provided by Barnard.  Further, by accepting and taking possession of the services and materials provided by Barnard, HWT was unjustly enriched when they failed and refused to pay Barnard.  Accordingly, Barnard is entitled to and hereby seeks its actual damages, attorneys' fees and expenses, court costs, and pre-judgment and post-judgment interest. Because HWT is a joint venture and Jacobs and CDM are the joint venturers, Jacobs and CDM remain liable for HWT's conduct.

## Cause of Action No. 3: Promissory Estoppel

38.      The allegations in paragraphs 1 through 32, inclusive, are re-alleged and incorporated herein by this reference as though set forth in full herein.

39.      Alternatively, Barnard asserts a claim for promissory estoppel.  HWT promised Barnard that it would pay Barnard for the work performed and that Barnard would be able to perform the work as scheduled.  Barnard reasonably and substantially relied upon this promise to its detriment by performing the work.  Barnard's reliance was foreseeable by HWT.  As such, injustice can be avoided only by enforcing HWT's promises.  Barnard is entitled to and hereby seeks its actual damages, attorneys' fees and expenses, court costs, and pre-judgment and post-judgment interest. Because HWT is a joint venture and Jacobs and CDM are the joint venturers, Jacobs and CDM remain liable for HWT's conduct.

## Cause of Action No. 4: Violation of Texas Prompt Pay Act

40.      The allegations in paragraphs 1 through 32, inclusive, are re-alleged and incorporated herein by this reference as though set forth in full herein.

41.      Barnard also asserts that payments owed to it by HWT are governed by the provisions of Chapter 28 of the Texas Property Code, also known as the Texas "Prompt Pay Act." As contractor, HWT failed to pay Barnard for all work that Barnard performed on the Project. In addition to the actual damages and amounts wrongly withheld, Barnard is entitled to and does hereby seek the interest permitted under the Prompt Pay Act, and its attorneys' fees and costs. Because HWT is a joint venture and Jacobs and CDM are the joint venturers, Jacobs and CDM remain liable for HWT's conduct.

**Cause of Action No. 5: Bond Claim**

42.     The allegations in paragraphs 1 through 32, inclusive, are re-alleged and incorporated herein by this reference as though set forth in full herein.

43.     At dates not presently known by Barnard, Defendants Fidelity, Federal, and Berkshire entered into performance bonds and payment bonds with HWT. The bond numbers are 9274078, 47SUR300035010010, 9270010, 82456977, and 47SUR300043010020.[2] HWT executed the bonds as principal and Fidelity, Federal, and Berkshire executed the bonds as sureties. The Texas Government Code gives a direct cause of action to all claimants, such as Barnard, who supply materials in the prosecution of the work provided for in the contract.

44.     Barnard has perfected its bond claim against Fidelity, Federal, and Berkshire on the bond for all or part of Barnard's claim in the sum of $5,528,103.46, which reflects unpaid pay applications and retainage through April 2020, in accordance with the provisions of the Texas Government Code, and all conditions precedent to perfection and payment of said claim have been performed.  Demand for payment has been made, yet Fidelity, Federal, and Berkshire have refused to pay this debt. Therefore, Fidelity, Federal, and Berkshire are jointly and severally liable to Barnard for the unpaid sums.  Barnard would further show that it is entitled under this theory of recovery to recover its reasonable attorneys' fees, costs, and interest.

### F.     REQUEST FOR DECLARATORY JUDGMENT

45.     Pursuant to the Texas Uniform Declaratory Judgments Act in Chapter 37 of the Texas Civil Practice & Remedies Code, Barnard seek the following judicial declarations:

> a.  The liquidated damages provision in the Subcontract is unenforceable because any harm claimed by HWT, Jacobs, or CDM as a result of any breach by Barnard was not incapable or difficult of estimation;

---

[2]True and correct copies of the performance bond documentation and Barnard bond claim notice are attached hereto as **Exhibits B** and **C** respectively.

b. The liquidated damages provision in the Subcontract is unenforceable because the amount of the liquidated damages called for is not a reasonable forecast of just compensation, given that Barnard's performance was scheduled to complete, and did in fact complete, well before the project as a whole could be completed and put into operation, and well before HWT intended to use either of the 108" pipes for water transmission, such that HWT could suffer no economic harm as a result of any Barnard delay;

c. The liquidated damages provision in the Subcontract is unenforceable because there is an unbridgeable discrepancy that exists between HWT, Jacobs, and/or CDM's actual damages, if any, and the liquidated damages to be assessed under the provision; and

d. The liquidated damages provision is unenforceable under Texas law because HWT cannot prove that it suffered any actual damage as a result of any alleged Barnard delay.

46.     Pursuant to Section 37.009 of the Texas Civil Practice & Remedies Code, Barnard requests the Court award it all of its reasonable and necessary attorneys' fees and costs that have or will be incurred in connection with its claims for declaratory relief.

## G.     ATTORNEY'S FEES, COSTS, AND INTEREST

47.     Pursuant to Chapters 37 and 38 of the Texas Practice and Remedies Code and Chapter 28 of the Texas Property Code, Section 2253.073 of the Texas Government Code, and per the prevailing party provision of the Subcontract, Barnard is entitled to recover its reasonable and necessary attorneys' fees from Defendants. An award of attorney's fees to Defendants would be equitable and just. Barnard requests that the Court award it all of the reasonable and necessary attorney's fees and costs that they have and will incur in their claims.

48.     Barnard likewise requests that it be awarded its costs and expenses.

49.     Barnard also seeks pre-judgment and post-judgment interest at the maximum rates allowed by law.

50.     All conditions precedent to Barnard's recovery on its claims and causes of action have occurred, been performed or have been waived.

## H.     JURY DEMAND

51.     Barnard hereby requests and demands a trial by jury.

## I.     PRAYER FOR RELIEF

52.     Based on the foregoing allegations, Barnard prays that the Court enter a judgment in Barnard's favor on its claims against Defendants, and award Barnard the following remedies against Defendants:

    a.   Actual damages;

    b.   Declaratory judgment relief;

    c.   Reasonable attorney's fees;

    d.   Prejudgment and post-judgment interest as permitted by law;

    e.   Costs; and

    f.   Any other legal or equitable relief that Barnard may be entitled to recover.

DATED: October 19, 2020

Respectfully submitted,

**PECKAR & ABRAMSON, P.C.**


By:     */s/ George C. Baldwin*
         **George C. Baldwin** (attorney in charge)
         Texas State Bar No. 01625020
         gbaldwin@pecklaw.com
         111 Congress Avenue, Suite 1010
         Austin, Texas 787101
         Telephone: 512-275-1786
         Facsimile: 512-236-0682


         and


         **Timothy A. Rothberg**
         Texas State Bar No. 24060525
         trothberg@pecklaw.com
         3050 Post Oak Blvd., Suite 500
         Houston, Texas 77056
         Telephone: 713-568-1500
         Facsimile: 713-568-1490

**ATTORNEYS FOR PLAINTIFF, BARNARD CONSTRUCTION COMPANY, INC.**